Filed 2/18/26  In re E.G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | B344099 (Los Angeles County Super. Ct. No. 24CCJP03596B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  A.G.,  Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Craig S. Barnes, Judge.  Affirmed.

Cheryl Spano, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Eden Gharapet, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, A.G. (father) argues substantial evidence does not support the juvenile court's jurisdictional findings that he failed to protect his 12-year-old daughter E.G. (daughter) from sexual abuse. After father filed his appeal, the juvenile court terminated jurisdiction and released daughter to father and his wife C.G., daughter's mother (mother). Thus, as an initial matter, we address whether father's appeal is justiciable. We conclude, even if his appeal is moot, we are persuaded to exercise our inherent discretion and consider the merits of his appeal. We find no error as to the juvenile court's jurisdictional findings under Welfare and Institutions Code section 300, subdivision (d). Thus, we affirm.

## BACKGROUND

### 1. The Family

Father and mother lived in a one-bedroom apartment with daughter, two minor sons, and one adult son. By all accounts, the family members got along with each other, and the children were well behaved. Daughter slept in the bedroom with her three brothers. Mother and father slept in the living room. Although mother had asked daughter to sleep with her in the past, daughter preferred to sleep in the bedroom. When the underlying proceedings began, daughter was 13 years old, one of

2

the minor sons was 15 years old, and the other was 10 years old. The adult son had moved in with the family one and a half years earlier after arriving from Guatamala. Mother and father have three additional adult children who live in Guatamala.

Daughter spent her time either at home or at school. Most mornings, mother left for work around 7:00 a.m. and returned home after 5:00 in the evening. Father took the minor sons to school in the mornings, leaving home with them around 7:30 a.m. Adult son took daughter to school, leaving home with her between 8:00 a.m. and 8:10 a.m. In the afternoons, after school, father brought the younger minor son home, adult son or father brought daughter home, and the older minor son arrived home on his own. Father worked nights and left home in the evenings after the children had arrived home from school.

## 2. Events Preceding Petition

In late October 2024, it was discovered that daughter was approximately 33 weeks pregnant. Until that time, no one in daughter's family, including daughter, knew she was pregnant. Everyone was shocked. A police report was filed and the Los Angeles County Department of Children and Family Services (Department) was notified.

Prior to discovering the pregnancy, rumors were circulating at daughter's school that she was pregnant. A physical education teacher and a campus aid both noticed daughter had gained weight. Beginning in at least early October 2024, staff and teachers at the school tried to assess whether daughter was pregnant, but it was difficult because she generally wore a baggy sweatshirt at school and, when asked, she denied being pregnant. Eventually, in late October 2024, the school nurse referred daughter to a nearby clinic, where she took a pregnancy test.

3

When told she was pregnant, daughter had no reaction. Daughter indicated she did not know how pregnancy occurred. The school nurse believed daughter genuinely was surprised to learn she was pregnant.

Daughter denied knowing how she became pregnant or who got her pregnant. In response to questions about her pregnancy, daughter generally remained silent or simply stated, " 'I don't know.' " She said the father was neither at school nor at home. Eventually, daughter replied "no" when asked if father could be the father of her child. At one point, daughter said she missed her period, at another time she said she had not missed a period. According to mother, daughter did not tell mother when she had her period, but daughter would let mother know when she needed sanitary pads. In October 2024, mother stated daughter asked for pads the previous month. Mother also stated she could tell when daughter had her period because daughter had severe cramps.

No one in the family household had seen signs of daughter's pregnancy. Father had not noticed weight gain and said daughter had not complained that her clothes no longer fit. Adult son similarly stated he had not noticed weight gain or daughter's body otherwise to have changed. Mother "had no idea" daughter was pregnant. The older minor son had observed no signs that daughter was pregnant and could not tell she was pregnant. The younger minor son said he noticed daughter had gained weight, but he assumed it was because she was eating a lot. Earlier, however, he said he had not noticed any changes to daughter's body and said she did "not have a normal pregnant belly."

4

It was difficult to tell daughter was pregnant if she was wearing a baggy sweatshirt, which she often wore. However, daughter stated at home she wore shorts and T-shirts that were form fitting. Mother said daughter wore baggy clothes at home. Adult son said she wore fitted shirts and loose pants at home, while father stated she wore pajamas or her school uniform. One minor son said daughter wore fitted T-shirts and pants at home, while the other said she wore loose clothes at home. A nurse practitioner reported that when daughter's abdomen was uncovered, it was evident she was pregnant.

Because daughter was rarely if ever unsupervised and spent her time either at home or at school, it was believed someone in her household had impregnated her. After learning of daughter's pregnancy, mother and father agreed to a seven-day safety plan. Father and adult son moved out of the house and minor sons were not allowed to be alone with daughter. After seven days, father returned home. Mother and father agreed the children would not be left unsupervised with father until paternity was determined for daughter's child. Mother and father cooperated with the Department and were supportive of daughter.

Eventually, mother and father confronted adult son, and he confessed he was the father of daughter's child. Father said adult son "kicked himself out of the home due to his own behavior." Father no longer wanted to be involved with adult son. Father said he would protect daughter from adult son and mother would contact law enforcement if adult son returned to the home. Mother no longer wanted adult son in her home or around her children. Prior to learning of daughter's pregnancy,

no one in the household had noticed daughter and adult son acting inappropriately with each other.

### 3.    Petition

After investigating the circumstances surrounding daughter's pregnancy, the Department was concerned for daughter's safety and questions remained regarding parents' supervision (or lack thereof) of their minor children.  Paternity of daughter's unborn child also remained unclear, and the Department believed the parents reasonably should have known daughter was pregnant.

Accordingly, in November 2024, the Department filed a three-count Welfare and Institutions Code section 300 petition on behalf of daughter and minor sons.[1]  The three counts of the petition were identical and brought under subdivisions (b), (d), and (j) of section 300.  Each count alleged daughter had been sexually abused by someone in her household, mother and father knew or reasonably should have known of the sexual abuse, and mother and father failed to protect daughter, putting daughter and minor sons at risk.[2]

At the initial hearing on the petition, the juvenile court released daughter to her parents under Department supervision.  The court ordered the Department to make unannounced home visits and ordered adult son to stay away from daughter and the family home.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Eventually, the juvenile court dismissed minor sons from the petition.  Accordingly, and because they are not subjects of this appeal, we mention them only to the extent necessary.

6

## 4.      Further Investigation

Sometime after the initial hearing, daughter gave birth to a baby girl.

Prior to adjudication, the Department continued its investigation.  As before, daughter refused to provide any information regarding her pregnancy, including information about the father.  Regarding the allegations in the petition, daughter stated, " 'I don't like how it says it's my parents' fault.  It doesn't seem like it's their fault to me, it's mine for not speaking out.' "  The older minor son similarly stated, " 'I don't like how it says they "failed to protect the child or reasonably should have known["] ' " and " 'this is not my parents' fault.  It's not [daughter's] fault, she was sexually abused, it's the person's fault who actually did this.' "

The members of daughter's household continued to report they had not known daughter was pregnant and had not noticed anything strange about daughter and adult son's relationship.  They did not know where adult son was and had not spoken with him.  Mother agreed she had "failed to notice things," stating, "[W]e failed her [daughter]."  Father said, "[I]t hurts my stomach thinking about what happened," and "I don't accept him [adult son]."  Father denied he had sexually abused daughter.  He noted daughter was able to shower and dress herself privately at home.  Mother and father continued to cooperate with the Department and law enforcement.

Officers investigating the criminal case indicated they had narrowed down the suspects to father, adult son, and the older minor son.  Father and the older minor son provided DNA samples.  After daughter gave birth, a DNA sample was taken from her infant child.  Given that adult son had disappeared and

father and mother had reported he confessed to them, it appeared likely adult son was the perpetrator. Nonetheless, law enforcement could not simply take parents' word and could not rule out either father or older minor son until DNA results were received, which could take up to six months.

Although the Department "considered a voluntary case for the family," it determined continued court supervision was "warranted" because law enforcement had not yet ruled out father or older minor son as perpetrators. The Department also believed court supervision was necessary to ensure the family continued to have no contact with adult son so as to protect daughter from further abuse.

The day before the adjudication, the Department submitted a last minute report for the court. The Department reported, among other things, that the family had been responsive to assistance for daughter and her infant child, mother had stopped working, and mother was "hands on and cares for" the infant. The Department also noted mother and father were "responding appropriately to the sexual abuse to [daughter]. They believed her, are protecting her from further contact with the abuser/adult sibling and supporting her as much as they are able to." The Department also reported "there have been no reported safety concerns." Considering the family's progress, the Department changed its earlier recommendation that mother and father attend sexual abuse awareness classes to a recommendation that they address those issues and others in individual counseling.

## 5.    Adjudication and Disposition

A combined adjudication and disposition hearing was held on January 29, 2025. At that time, the DNA test results remained pending.

8

Counsel for daughter asked the court to sustain the petition. Counsel noted, while parents had supported and protected daughter since discovering her pregnancy, it was still unknown who the father of her child was and it was still too early to know if parents could "remain sufficiently protective if [adult son] attempts to reconnect with the family." Counsel also believed "parents should have reasonably known of what was going on." Counsel for the Department similarly noted, although parents did not seem to know of daughter's pregnancy, they reasonably should have known. Counsel argued the subdivision (d) count was met because "it's 100 percent certain that [daughter] was sexually abused by a member of this household."

On the other hand, counsel for father asked the court to dismiss the petition in its entirety. Counsel stated there had been "no indication that the minor was pregnant," the parents were unaware of the pregnancy, and "parents have shown their protective capacity since day one of this case." Counsel also argued the subdivision (b) count could not be sustained because there was no current risk to daughter. Counsel believed the only reason the petition was filed was because the father of daughter's child was still unknown, which counsel argued was the Department's burden to show. Counsel for mother similarly argued there was no current risk and, therefore, the court could not sustain the subdivision (b) count. Counsel stated there were no signs of daughter's pregnancy and since discovering the pregnancy, parents had been protective. Counsel asked the court to amend the subdivision (d) count so that parents were nonoffending, stating "it's clear that it was not due to parental fault."

9

After hearing argument, the juvenile court amended the petition by striking reference to the two minor sons, sustained the subdivision (b) and (d) counts as amended, and dismissed the subdivision (j) count. The court believed the parents "made a lot of assumptions" regarding adult son, some of which were "unwarranted," and made no "inquiry to see if he posed any risk to [daughter]." The court acknowledged the parents were cooperating with the Department "to address these issues," but noted "some of these are jarring to the point where I think they're still trying to get their bearings here and will need to have the services to ensure that there's no further risk to [daughter]." Although the court noted parents did not need to test regularly to see if daughter was pregnant, the court was concerned that parents might abdicate responsibility by relying heavily on daughter's privacy to the exclusion of inquiring as to her menstrual cycle. The court stated, "[T]here's a reference to menstruating, and there's an extended period of time where there's no inquiry there." The court also noted daughter was the only female in close setting with her male siblings. The court found parents "should have known."

The court declared daughter a dependent of the court and released her to her parents under Department supervision. The court ordered family preservation services and reiterated its order that adult son have no contact with daughter or the family home.

**6.    Appeal and Post-appeal Orders**

Father appealed the juvenile court's January 29, 2025 jurisdictional findings.

Six months later, on July 30, 2025, the juvenile court terminated jurisdiction and released daughter to her parents.

10

We granted the Department's motion for judicial notice of the juvenile court's July 30, 2025 order.

<h1 style="text-align:center">DISCUSSION</h1>

## 1. Mootness

As an initial matter, we address whether father's appeal is moot. As noted above, after father filed the instant appeal, the juvenile court terminated its jurisdiction and released daughter to her parents. We asked the parties to brief whether these postappeal orders rendered father's appeal moot.

The Department claims the juvenile court's order terminating jurisdiction arguably rendered father's appeal moot. Father, on the other hand, argues his appeal is not moot. Relying on our Supreme Court's recent opinion in *In re S.R.* (2025) 18 Cal.5th 1042, father claims his appeal is not moot because the allegations underlying dependency jurisdiction here must be reported for inclusion in California's Child Abuse Central Index (CACI). Father explains how inclusion in the CACI would directly affect his legal rights. Both parties also recognize that, even if postappeal events rendered father's appeal moot, we nonetheless have inherent discretion to consider father's appeal. (*In re D.P.* (2023) 14 Cal.5th 266, 285.)

We agree with father's position—which follows that of our Supreme Court in *In re S.R.*, *supra*, 18 Cal.5th at page 1048— that were the findings in this case to result in his inclusion in the CACI, his legal rights would be affected and his appeal would not be moot. It is not clear, however, that the sustained allegations here mandate a report to the CACI. "The CACI lists persons who have substantiated reports of child abuse or severe neglect against them." (*Id.* at p. 1052; Pen. Code, § 11169, subd. (a). Here, there is no sustained allegation that father physically or

11

sexually abused daughter.  As to the sustained failure to protect allegations, it is not clear these would fall within the definition of "severe neglect" required for reporting to the CACI.  (See Pen. Code, §§ 11165.2, subd. (a) and 11169, subd. (a).)

In any event, it is not necessary for us to determine whether the sustained allegations here mandate a report to the CACI.  We are persuaded that, even if father's appeal is moot, we nonetheless should exercise our discretion to consider the merits of his appeal, a result the Department does not oppose.  (*In re D.P.*, *supra*, 14 Cal.5th at p. 285.)  Thus, we turn to the merits of father's appeal.

**2.    Jurisdiction**

The juvenile court exercised its jurisdiction under subdivisions (b)(1) and (d) of section 300.  We consider subdivision (d) first.

**a.    Section 300, subdivision (d)**

Under subdivision (d) of section 300, a juvenile court may assert dependency jurisdiction over a child when either "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused" "by the child's parent or guardian or a member of the child's household."  (§ 300, subd. (d) (subdivision (d).)  The court may also exercise jurisdiction under subdivision (d) if "the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."  (*Ibid.*)  For purposes of this subdivision, "sexual abuse" is defined by section 11165.1 of the Penal Code, which includes rape, statutory rape, and lewd and lascivious acts upon a child.  Unlike subdivision (b) of section 300, jurisdiction under subdivision (d) does not require a finding of current risk at

12

the time of adjudication.  (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803.)

### b.    Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings [and disposition order] of the trial court." ' "  (*Ibid.*)  In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order.  (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings."  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  Substantial evidence " 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' "  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

### c. Substantial evidence supports dependency jurisdiction under subdivision (d).

The sustained subdivision (d) count includes two parts. First, the juvenile court found, "The child [daughter] was sexually abused by a member of the child's household, resulting in the pregnancy of the child." Second, the court found father and mother "failed to take action to protect the child when they knew, or reasonably should have known, of the sexual abuse of the child." Father argues substantial evidence does not support jurisdiction under subdivision (d). We are not persuaded.

As to the first part of the subdivision (d) count, it cannot reasonably be disputed that when daughter was 12 years old, she was raped and impregnated by someone in her household. This alone gives rise to dependency jurisdiction under subdivision (d) and is sufficient for us to affirm the court's exercise of jurisdiction. (*In re Carlos T.*, *supra*, 174 Cal.App.4th at pp. 803–804.)

As to the second part of the subdivision (d) count—that father reasonably should have known of the sexual abuse and failed to protect daughter—it is undisputed that, until daughter's pregnancy was discovered, father had failed to protect her from sexual abuse. This is not surprising because, until alerted to the pregnancy, father was unaware of both the abuse and its telltale sign, daughter's pregnancy. Thus, we must consider whether substantial evidence supports the finding that father reasonably should have known of the sexual abuse.

Father argues there was no reason for him to have been aware of daughter's pregnancy (and, therefore, the sexual abuse) because daughter showed no physical or behavioral signs of pregnancy and she repeatedly denied being pregnant. The record

14

does not reveal daughter exhibited behavioral changes related to her pregnancy. However, there is evidence that, at least a few weeks before her positive pregnancy test, daughter was showing physical signs of being pregnant. At school, people noticed physical changes. Not only were teachers and staff trying to assess whether daughter was pregnant, but rumors were circulating that she was pregnant. Although father notes it was difficult to see the size of daughter's abdomen when she wore baggy sweatshirts, which she often wore, there is evidence that at least sometimes she wore fitted shirts at home. Indeed, her 10-year-old brother noticed she had gained weight, although he did not know why and believed it was due to eating a lot. Moreover, mother agreed she had "failed to notice things," stating she and father had "failed" their daughter. Thus, by the time daughter's pregnancy began "showing" father reasonably should have noticed and, at the least, asked questions (as was being done at school) so that he could have taken steps to protect daughter from further abuse or harm.

Because we conclude the record supports a finding that father reasonably should have known of daughter's pregnancy (and, therefore, the sexual abuse) due to physical signs that daughter was pregnant, we need not and do not address father's additional argument that the juvenile court incorrectly faulted him for not perceiving improper conduct between adult son and daughter. We do note, however, the record holds less support for this proposition. Similarly, although the juvenile court discussed the parents' apparent lack of awareness of daughter's menstrual cycle, we do not find that pertinent to father's appeal. The record reveals daughter communicated about her menstrual cycle with

15

mother and not father, which is reasonable in a mother-daughter relationship.

Finally, father also argues substantial evidence did not support a finding of current risk of harm at the time of the adjudication hearing.  As noted above, however, findings under subdivision (d) do not require a current risk of harm.  (*In re Carlos T.*, *supra*, 174 Cal.App.4th at p. 803.)  Thus, we do not address that here.  Similarly, in considering subdivision (d), we are not persuaded by the cases on which father relies that address current risk of harm under subdivision (b) of section 300. (See *In re F.V.* (2024) 100 Cal.App.5th 219; *In re R.M.* (2009) 175 Cal.App.4th 986; *In re Savannah M.* (2005) 131 Cal.App.4th 1387.)

Because we find jurisdiction was proper under subdivision (d), we need not and do not address the remaining jurisdictional findings under subdivision (b) of section 300.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

## DISPOSITION

The juvenile court's January 29, 2025 order is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

RICHARDSON, J.

17